## GARNER et al. v. RIDDLE.

No. 19040.   Opinion Filed Oct. 22, 1929.

Rehearing Denied Dec. 10, 1929.

E. G. Wilson, R. C. Searcy, and W. H. Kisner, for plaintiffs in error.

Vance & Bliss, for intervener, J. B. Riddle.

FOSTER, C.  The original action, in which the judgment appealed from in this case was granted, was commenced in the district court of Cherokee county, by the Myercord Company against International Specialties Company. The original petition does not appear in the record, but it was admittedly for the purpose of collecting a personal judgment against the International Specialties Company, and by amendments to the petition the plaintiffs in error here, W. L. Garner, D. J. Garner, and Eldon Mill & Lumber Company, were made parties defendant and a lien sought upon the property alleged to belong to them. J. B. Riddle filed a plea of intervention in that case, alleging that the International Specialties Company, W. L. Garner, D. J. Garner, and Eldon Mill & Lumber Company were indebted to him in the sum of $5,000, and for a second cause of action alleged that W. L. Garner was indebted to him an additional sum of $5,000. The jury returned a verdict in favor of the interpleader, J. B. Riddle, for the sum of $5,000 against the International Specialties Company, and a judgment of $2,000 against W. L. Garner, D. J. Garner, and the Eldon Mill & Lumber Company. The court entered judgment accordingly, and from the judgment of $2,000, W. L. Garner, D. J. Garner, and the Eldon Mill & Lumber Company prosecute this appeal.

There are only two questions of law presented: First, that the court did not have jurisdiction of the parties at the time the judgment was entered; and, second, that the verdict and judgment is not supported by the law and evidence.

The record in the case is very voluminous, consisting of more than 1,000 pages, and the testimony is very conflicting and involves several transactions.

It appears that in May, 1924, W. L. Garner and D. J. Garner were the owners of the

Eldon Mill & Lumber Company, located in Cherokee county, and that they owned a large tract of timber land and lumber in addition to their mill located at Eldon; that the International Specialties Company was a common-law trust in which F. E. Riddle and several other persons at Tulsa were the organizers, F. E. Riddle being the president and general manager of the company.

The International Specialties Company was the owner of a certain patent for a toy known as the "Grand-Dad Toy," the manufacture of which necessitated a considerable amount of lumber, and certain machinery. The company apparently had very little property or assets in addition to the patent.

On May 25, 1925, a contract was entered into between the Eldon Mill & Lumber Co., W. L. Garner, and D. J. Garner, parties of the first part, and International Specialties Company, as party of the second part, whereby it was agreed that the parties of the first part should transfer to the said common-law trust their mill and machinery located at Eldon, together with certain timber land which they possessed, and in consideration therefor the said W. L. Garner and D. J. Garner were to receive $10,000 of the capital stock of said International Specialties Company, and in addition thereto were to be employed by said company at $100 and $75 per month, and to be increased as the business increased, their duties being the management of the mill at Eldon, and the manufacture of the toys covered by the patent.

About the same time that this contract was entered into, W. L. Garner was the successful bidder for a school building at the Sequoyah Orphans Training School, located at Tahlequah, to be erected by the United States government. W. L. Garner, being unable to finance the construction of said building, entered into an arrangement in writing with the International Specialties Company on June 20, 1925. By the terms of this written contract, the International Specialties Company was to furnish the money necessary to be advanced in the construction of said building, and the checks received from the United States government in payment thereof were to be sent to J. B. Riddle, the intervener, at Rush Springs, Okla., and after the payment of all the expenses necessary for the construction and the repayment to J. B. Riddle of the amount he advanced, the remaining part or profit in the building was to belong to the International Specialties Company.

. About the same time, the International Specialties Company made arrangements with J. B. Riddle to advance the sum of $5,000, it being understood that if upon investigation of the workings of the International Specialties Company, he was satisfied with the conduct of the business of that company, he would become manager of the company, and stock would be issued to him in payment of his $5,000 advanced. But in case, after a thorough investigation, he was dissatisfied with the conduct and operation of said company, the $5,000 would be considered as a loan. It also appears that at the time and prior to the agreement between the International Specialties Company and W. L. Garner, concerning the construction of the school building, it was understood between all the parties that while the money necessary for the construction was to be advanced in the name of the International Specialties Company, in truth and in fact, J. B. Riddle, the intervener herein, was to advance the money, and for that reason the checks from the government were to be sent to J. B. Riddle at Rush Springs, Okla.

Pursuant to these agreements, J. B. Riddle advanced the $5,000 and certain other sums, the evidence being in conflict as to the exact amount; it being admitted, however, by the plaintiffs in error that he advanced $15,331.58, but that of this amount only $7,236.40 was advanced for the construction of the building at Tahlequah, the other sums advanced being for the manufacture of toys.

It is admitted that W. L. Garner sent checks to J. B. Riddle in the sum of $10,092, which checks he received from the United States government, and it is the contention of plaintiffs in error that they manufactured certain toys amounting to something over $10,000, which belonged to the International Specialties Company and J. B. Riddle, making a total sum of over $20,000, and that therefore J. B. Riddle and the International Specialties Company are indebted to them in the sum of about $4,000.

The money advanced by J. B. Riddle, as well as the money received from the United States government, was all deposited by Riddle in an account at the First National Bank at Rush Springs in the name of the International Specialties Company, and J. B. Riddle issued checks upon this account in payment of claims for the construction of the building, also for expenses in the manufacture of toys. These checks and payments were issued upon the drafts of W. L. Garner, and J. B. Riddle had no way of knowing whether the money which he sent

in the name of the International Specialties Company was for payment upon the school building, or for expense in the manufacture of toys, or for the buying of new machinery necessary for such manufacture.

In the original agreement, it appears that W. L. Garner had requested an advancement, for the purpose of constructing the school building, of only about $2,000. But as the payments from the government were slow in coming in, it was necessary to advance a great deal more than that, and, as above indicated, Garner admits that there was advanced something over $7,000.

According to the testimony, J. B. Riddle was not satisfied with the conduct of the business of the International Specialties Company, and therefore never be ame interested in said company, and never became its manager, as he originally intended to do, if the operation and conduct of the company were satisfactory, and therefore he considered the $5,000, as well as the other money advanced, a loan to the International Specialties Company, W. L. Garner, D. J. Garner and the Eldon Mill & Lumber Company. While the checks were issued in the name of the International Specialties Company and signed by J. B. Riddle, it was his claim and contentions that he was doing this only as paymaster for the International Specialties Company, and had no interest therein, and that the reason for his handling the funds of the company was in order to protect the amount which he had advanced.

It appears that, in the original action in this case, the district court decided that the terms and conditions of the original agreement of May, 1925, between the International Specialties Company and plaintiffs in error here had not been complied with, and that the International Specialties Company never acquired the mill at Eldon, nor the timber and timber land included in the original contract, but determined that said machinery, together with the timber and timber land, was still the property of plaintiffs in error here.

After considerable money had been advanced under the arrangements as above set out, the United States government delayed sending the final estimate upon the building, and in paying the amount due, because of some other lien or claim. At any rate, W. L. Garner and the intervener, J. B. Riddle, made a trip to Washington, and it was agreed with the Secretary of the Interior, that the checks should be sent direct to J. B. Riddle at Rush Springs, and a letter or statement in writing to that effect was filed with the Secretary of the Interior by W. L. Garner.

Before the final payment was made by the United States government, however, J. B. Riddle had refused to advance any more money, and there were certain claims against the building which remained unpaid. For that reason W. L. Garner canceled his agreement and directed the Secretary of the Interior to send the final payment, which consisted of about $5,100, direct to him, which was done, and he used the money in the payment of the claims against the building up to about the sum of $2,700 to $3,600, the exact amount being somewhat in dispute. The other part of the $5,100, according to the testimony of Garner, went to pay certain claims which he had advanced out of his own personal funds.

The money advanced by J. B. Riddle was used in the construction of the school building, in the buying of new machinery for the mill, for the payment of lumber and other expenses in the operation of the mill, and in the manufacture of the toys which were to belong to the International Specialties Company.

As we view the entire record, which, as stated above, is very long and the testimony very conflicting, and in some places very difficult to understand, the contention of the plaintiffs in error is that the money advanced by J. B. Riddle was purely on behalf of the International Specialties Company, and that these plaintiffs in error were not parties to the International Specialties Company, did not join in the trust agreement, and, as the court had found that their contract to turn over the mill and timber land was not effective, they were in no way bound to pay the debts of that company; and if J. B. Riddle advanced the money, as he contends, he had no cause of action against them, but only against the International Specialties Company.

On the contrary, it is J. B. Riddle's contention that his agreement to advance the money was with the International Specialties Company, but that W. L. Garner, acting on behalf of himself and the Eldon Mill & Lumber Company and D. J. Garner, was advised of all the facts, and that part of the money was for the benefit of these plaintiffs in error, and that they were liable therefor because they had received the benefit of the money, and especially the $5,100 received from the United States government, in buying new machinery and in conducting the business of the International Specialties

Company in manufacturing toys; that W. L. Garner had violated his agreement to send the final check direct to Rush Springs, and had appropriated it to his own use. J. B. Riddle admits that he advanced no money, personally, to W. L. Garner except as W. L. Garner was interested in the International Specialties Company.

We think there is sufficient testimony in the record to show that J. B. Riddle advanced at least $9,000 over and above that which he received in payment. Considering his agreement good, that upon his own option this should be considered as a loan, we can come to no other conclusion that that J. B. Riddle is entitled to at least the amounts represented by the two verdicts from some one. The court and jury found that he was entitled to $5,000 from the International Specialties Company, and $2,000 from plaintiffs in error here. No question is raised as to the $5,000, and we think the judgment of $2,000 against the plaintiffs in error is supported by the testimony.

Just on what theory the court and jury determined that J. B. Riddle was entitled to the $2,000 judgment, and just how they arrived at the amount, does not clearly appear from the record. We are of the opinion that the record shows an indebtedness of more than $7,000, which is the amount of two judgments against the plaintiffs in error and the International Specialties Company. The only question is whether or not these plaintiffs in error are liable for the $2,000.

Whether or not plaintiffs in error were liable under the original contract, we will not determine. There may be evidence in the record sufficient to show that they were liable even under the original arrangements between J. B. Riddle, the International Specialties Company, and the plaintiffs in error. But even though the testimony be not sufficient to support the judgment on this theory, we believe that since W. L. Garner agreed to send all the checks to J. B Riddle, and that he violated his agreement and admits that he had the $5,100 sent to him, and the record supports a finding that of this $5,100 only about the sum of $2,700 was paid for claims against the school building, and that he used the other money, even under his own testimony, in paying claims which he (W. L. Garner) had theretofore advanced, we think the expenditure of the remaining part, amounting to more than $2,000, would be sufficient to make them liable to J. B. Riddle for the amount of the judgment.

Plaintiffs in error also contend that the court had no jurisdiction in this case, because, at the time of the filing of the plea of intervention, the trial court had already determined that the property of the plaintiffs in error was not the subject of litigation, and had determined that their property was free to be handled as they pleased.

In the original action, a receiver was appointed, and on February 10, 1927, the court made an order that the property belonging to the plaintiffs in error was not under the control of the receiver, and although he apparently thereafter set aside this order, in so far as it affected the International Specialties Company and the plaintiffs in error, still, even assuming that this order was in effect, we cannot agree with the contention of the plaintiffs in error.

Assuming, without deciding, that at the time the plea of intervention was filed, the plaintiffs in error had no further interest in the action and were not parties thereto, they did not raise this question in the trial court. When the plea of intervention was filed, they first made a motion to make the same more definite and certain, and without having the motion passed upon, they filed their answer and asked for a judgment against J. B. Riddle as well as the International Specialties Company. No question of jurisdiction was presented to the trial court, and the same is now first presented on appeal. We think, clearly, they have waived the objection, if any they had. Sections 225 and 229, C. O. S. 1921, and the case of Goodrich v. Williamson, 10 Okla. 588, 63 Pac. 974, relied upon by plaintiffs in error, have no application to the facts in the case at bar.

If a defendant who has objected to the jurisdiction of the court over his person, after his objection has been overruled, voluntarily demands and receives affirmative relief in the action, he submits his person to the jurisdiction of the court for all purposes and will be deemed to have waived such objection. El Jardin Immigration Co. v. Hudson, 110 Okla. 147, 236 Pac. 386.

In the case at bar plaintiffs in error never made any objection to the jurisdiction of the court whatever, but voluntarily filed their answer, demanded affirmative relief, allowed a judgment of the court to go against them, and now for the first time present the same on appeal. Even if there had been no case pending in the district court of Cherokee county, or if plaintiffs in error had never been parties to the case in the trial court and had voluntarily come

into court, filed an answer, and asked for affirmative relief, the question of jurisdiction over the parties would have been waived.

That a verdict of a jury in a law case will not be reversed on appeal where there is any evidence reasonably tending to support the same, and that a finding and verdict is a finding of everything necessary to be found to sustain the verdict, and is conclusive upon this court upon doubtful and disputed questions, are principles which have been decided so often that it is unnecessary to cite authorities in support thereof.

Certain objections were made to the introduction of testimony, and also objections to certain instructions given, but these questions are not presented in the brief of plaintiffs in error nor contended for on appeal, and, under the well-recognized rule in this state, plaintiffs in error will be deemed to have waived the same.

From a consideration of the entire record, we believe there is evidence reasonably tending to support the verdict and judgment, and that, under the facts in this case, the court had jurisdiction of the parties.

The judgment is affirmed.

LEACH, REID, JEFFREY, and HERR, Commissioners, concur.

By the Court: It is so ordered.